UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TYHLAN DEES, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:20-cv-01791-SEP |
| | ) |
| IRON MOUNTAIN, INC., | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM AND ORDER

Before the Court is Defendant's Motion for Summary Judgment, Doc. [25]. The motion has been fully briefed. For the reasons set forth below, the motion is granted.

### BACKGROUND

Plaintiff Tyhlan Dees began working for Defendant Iron Mountain, Inc., on August 5, 2019, in its O'Fallon, Missouri, facility. Doc. [30] ¶¶ 3, 8. Plaintiff was assigned to work for Defendant by a third-party staffing company as a temporary worker. *Id.* ¶ 8. As a temporary worker, Dees was assigned to work on a project for Mercy Health System and reported to Steven Williams, a Program Manager, and Laura Mosillo, a Senior Consultant. *Id.* ¶ 10. During his temporary assignment, Plaintiff alleges that another employee, Floyd Crenshaw, an African-American male, discriminated against him and harassed him. *See id.* ¶¶ 12-14. Specifically, Plaintiff contends that Crenshaw was "unprofessional" to him and would put an elbow to his shoulder when they passed each other at work. *Id.* ¶ 13. He also alleges that when he and Crenshaw were in the bathroom together, Crenshaw said, "Man, it stinks in here" and turned off the bathroom lights as he exited. *Id.* ¶ 14. Crenshaw turned the lights back on before leaving and apologized to Plaintiff. *Id.*

In March 2020, Plaintiff was hired as a full-time casual employee at Iron Mountain and became a Project Specialist for the Mercy Health Project. *Id.* ¶ 16. In that role, Plaintiff was responsible for reviewing and classifying boxes of different types of records related to the Project. *Id.* ¶ 19. Plaintiff's employment was "project-based and dependent on the needs of the Mercy Health Project." *Id.* ¶ 16. His offer letter detailing his full-time arrangement specifically stated that his employment was expected to end on March 31, 2021, but that the company could

1

change that date in its discretion. *Id.* ¶ 17. Plaintiff still reported directly to Williams in this role but was "expected to take work direction" from Mosillo and Crenshaw, who had become Project Leads for Defendant. *Id.* ¶ 18.

Within Plaintiff's first two weeks as a full-time employee, he called off from work or left early on short notice more than once, in violation of Defendant's attendance policy. *Id.* ¶ 20. His absences were generally due to his daughter being ill. *Id.* Around that same time, Plaintiff asserts that Crenshaw was still harassing him at work, so he contacted Mosillo, seeking advice on how to improve his working relationship with Crenshaw.[1] *Id.* ¶ 21. He states that Crenshaw was "pretty much belittling [him], harassing [him], and just pretty much using [him] as an example in front of people." *Id.* (citing Doc. [28-3] at 90:8-22).[2] Plaintiff does not recall whether he discussed race or gender during his conversation with Mosillo. *Id.*

Following Plaintiff's conversation with Mosillo, Williams called an in-person meeting with Plaintiff and Crenshaw to discuss Plaintiff's concerns. *Id.* ¶ 22. During the meeting, Plaintiff "had an opportunity to tell Crenshaw what was 'bothering' him," which Plaintiff did. *Id.* ¶ 23. After Plaintiff shared his concerns, Crenshaw apologized and shook Plaintiff's hand. *Id.* Plaintiff maintains that, during the meeting, Williams "acknowledged [his complaints]" and noted that Crenshaw was "new at being a supervisor" and that Defendant would work with him on his behavior. *Id.* Plaintiff and Defendant dispute whether Plaintiff identified his race or gender as the impetus for Crenshaw's harassment towards Plaintiff at the meeting. *Id.* ¶ 24-25. Although Defendant claims that Plaintiff did not specifically discuss race or gender, Plaintiff contends that he "let both parties know how he felt" about Crenshaw's behavior. *Id.* 24.

Despite the meeting ending cordially, *id.* ¶ 23, Plaintiff asserts that it "had little to no effect on the harassment and discrimination" he faced. Doc. [29] at 1. Indeed, throughout his full-time employment he alleges that Crenshaw continued to discriminate against him and harass him in the following ways: by yelling at him to hurry up and move faster in front of other employees; by asking him why he said "der" instead of "there" and telling him that he didn't "have to be talking all ghetto"; by telling other employees that Plaintiff "stunk up the bathroom"

---

[1] Plaintiff also alleges that he had a phone call with both Williams and Mosillo regarding his concerns about Crenshaw's behavior towards him while he was a temporary employee at Iron Mountain. Doc. [30] ¶ 21. Plaintiff himself "does not recall bringing up race or gender" in any conversation. *Id.*

[2] References to Defendant's Statement of Material Facts, Doc. [28], Plaintiff's Statement of Material Facts, Doc. [30], and exhibits use the page numbers assigned by the Court's electronic filing system.

and referring to him as "doo-doo boy"; by discouraging other employees from speaking with Plaintiff; by flipping the lights on and off while Plaintiff used the restroom; and by approaching Plaintiff, flatulating, and walking away laughing. Docs. [30] ¶ 25; [37] ¶¶ 8-14.

On March 24, 2020, Plaintiff was involved in an incident at the facility related to COVID-19 and rumors that an Iron Mountain employee had contracted the virus. Doc. [30] ¶ 27. According to Plaintiff, he heard Dwight Mullen, the Operations Supervisor at the O'Fallon facility, take a phone call near the breakroom during which an employee informed him that he or she may be ill with COVID-19. *Id.* ¶¶ 15, 27. Plaintiff contends that, upon receiving that information, Mullen kicked him and the other employees out of the breakroom and put a mask on. *Id.* ¶ 27. This, Plaintiff alleges, caused a panic, and Plaintiff informed Mullen and his assistant, Pam Winston, that he was going to leave work early because of the threat of the virus. *Id.* Mullen and Winston also allegedly told Plaintiff that the building was set to be cleaned by a special cleaning crew, and that it would be safe to return to the facilities the following day. *Id.* Plaintiff also contends that he called Mosillo and Williams and left them voicemails informing them of the situation and his decision to leave early.[3] *Id.*

Defendant contends that it was Plaintiff who incited the panic that day by spreading false rumors, and that he left the facilities without informing management that he was leaving. *Id.* Following the chaos, Mullen informed Williams about the incident, and after investigating, Williams decided to suspend Plaintiff without pay pending a review of the incident by the Human Resources department. *Id.* ¶¶ 28, 30. He was suspended from March 25, 2020, until April 13, 2020. *Id.* ¶ 30. On March 28, 2020, Williams spoke to Plaintiff about the incident, and in late March and early April 2020, Maria Boykin, one of Defendant's Human Resources Generalists, investigated the matter further. *Id.* ¶¶ 31-33. Boykin could not corroborate that Plaintiff spread a rumor about an employee contracting COVID-19, but she concluded that Plaintiff left the facility "without notifying an exempt-level supervisor in violation of [Defendant's] policies." *Id.* ¶ 33.

Plaintiff was reinstated after the conclusion of the investigation, but the parties dispute whether he was paid for some or all the days that he was out on suspension, with Plaintiff contending that he was not paid in full, but Defendant claiming that he was. *Id.* ¶ 34. Despite

---

[3] Defendant does not dispute that Plaintiff called and left voicemails for Mosillo and Williams to inform them that "he was leaving early because he felt unsafe." Doc. [37] ¶ 30.

3

being reinstated, Williams issued Plaintiff "a final written warning" for leaving the facility without notifying a supervisor and for incurring 2.5 unplanned absences in his first 90 days of employment as a full-time employee.[4]  *Id.* ¶¶ 34, 35.  Plaintiff argues that Williams's final warning was pretextual and discriminatory to the extent it refers to his 2.5 absences because "female and Caucasian workers [were permitted] to miss days to take care of their sick children without discipline." *Id.* ¶ 35.  Plaintiff maintains that Crenshaw and Mullen's "lying" about the incident constitutes harassment, discrimination, and retaliation. *Id.* ¶¶ 36, 37.

Upon his return from the suspension, Plaintiff alleges that Crenshaw continued to harass him and discriminate against him in the following ways:[5]  by being "distant" with Plaintiff; by discouraging others from speaking with Plaintiff because he was "on his last leg"; by calling Plaintiff "that brother" when talking to his coworkers; by discussing Plaintiff's suspension with his coworkers; by harassing him to wear a uniform that was too big for him due to a mistake on the uniform provider's end; by failing to give him a gift card as a bonus that other workers all received as a reward; and by harassing him for coming back late from lunch and other breaks while female and Caucasian workers were permitted to do so. *Id.* ¶ 36.

Plaintiff also contends that Mullen harassed and discriminated against him in similar ways.  Specifically, he claims that, on one occasion, Mullen "looked in [Plaintiff's] general direction" and stated that he liked playing a game called "ring the rat's neck" and noted that "[his] favorite part is when he's choking the rat and it squirms." Doc. [30] ¶ 37.  Plaintiff also alleges that Mullen harassed him by telling him that he could not wear headphones while working, but allowed others—including an African-American female employee and a male employee—to do so.  *Id.*  Additionally, Plaintiff alleges that Mullen generally treated women and Caucasian employees more leniently than Mullen treated him, including by permitting female and Caucasian males to return from lunch and other breaks late.[6]  *Id.*

---

[4] Plaintiff still disputes that he did not tell a supervisor that he was leaving early on the day of the incident.  He maintains that he told Mullen and Winston that he was going home as he was leaving because they were standing near the exit, and that he also called Mosillo and Wilson to inform them that he was leaving because he felt unsafe.  Doc. [30] ¶ 35.

[5] In addition to his new allegations, Plaintiff also realleges the harassment and discrimination previously discussed.  *See supra* at 2-3.

[6] Defendant disputes this, noting that Plaintiff refers to only one Caucasian male named Mike who was allegedly permitted to come back late on a regular basis.  Doc. [37] ¶ 38.  Defendant contends that

Beginning in April 2020, and continuing until July 2020, Williams, Mosillo, and Crenshaw had several conversations with Plaintiff about his work performance.  *Id.* ¶ 37.  Specifically, they addressed with him mistakes they believed he made, including misclassifying a pallet of boxes and creating tags in error, as well as concerns about Plaintiff's continued use of headphones at work and refusal to wear his uniform.  *Id.* ¶ 39.  Plaintiff was not disciplined after any of those performance-related conversations.  *Id.* ¶ 40.  Plaintiff contends that his supervisors' performance-related concerns were a method by which to harass, discriminate, and retaliate against him because of his race, color, and gender.  *Id.* ¶¶ 37-39.  Plaintiff maintains that he never committed mistakes in his work but admits that he never complained to Defendant about the alleged harassment, discrimination, and retaliation with respect to the performance-related conversations.  *Id.* ¶ 41.

Allegedly because of Plaintiff's performance deficiencies, Williams "moved" Plaintiff from reclassifying records to reclassifying X-rays, a task that Williams believed required less skill.  *Id.* ¶¶ 42-43.  Still, Williams claims to have found Plaintiff's productivity to be lagging compared to other workers assigned to process X-rays.  *Id.* ¶ 43.  In particular, Williams noted that he trained one temporary worker on how to process X-rays after Plaintiff, and she quickly outpaced and outperformed Plaintiff in the number of boxes per week and per hour she completed, despite having less experience.  *Id.* ¶ 44.  Plaintiff denies that claim, arguing that Williams's decision to move Plaintiff from reclassifying records to X-rays constitutes harassment, discrimination, and retaliation, and that Williams intentionally isolated him to a "remote part of the building," and assigned him "undesirable boxes and pallets."[7]  *Id.*  He also contends that Crenshaw assigned him additional duties intentionally so that he would not be able to meet certain performance rankings.  *Id.*

Defendant contends that work began to slow down on the Mercy Health Project in August 2020, and specifically notes that Mercy Health System reconfigured its warehouse such that two Iron Mountain workers who were previously stationed onsite had to be relocated back to the O'Fallon facility.  *Id.* ¶¶ 45, 46.  Plaintiff, on the other hand, alleges that Defendant

---

Plaintiff has adduced no evidence demonstrating that other employees were not disciplined for coming back from breaks late, and also notes that Plaintiff concedes that he is not aware whether Mike was disciplined for such behavior or not.  *Id.* (citing Doc. [28-3] at 88:6-12).

[7] Although Defendant states that it was Williams's decision to move Plaintiff, Plaintiff appears to state that it was Crenshaw who isolated him and assigned him additional duties.  *See* Doc. [30] ¶ 44.

5

continued to hire workers for the Project and that there was no decrease in inventory. *Id.* ¶ 45. Defendant maintains that, because of the decline in work, as well as the additional staff at the O'Fallon facility, Williams determined that there was "no business need to have four Iron Mountain workers processing x-rays at the O'Fallon facility" and decided to let one of those four employees go. *Id.* ¶ 47. In his affidavit, Williams states that he selected Plaintiff for termination because he was the least productive on the team in terms of reviewing X-rays. *Id.* ¶ 48 (citing Doc. [28-1] ¶¶ 22, 22, 26). Plaintiff was terminated on August 26, 2020. *Id.*

In May 2020, prior to his termination, Plaintiff filed a Charge of Discrimination with the EEOC. Doc. [28-5]. He did not tell anyone at Iron Mountain that he filed the Charge, and Williams and Boykin testified that they were not aware of the filing at the time of Plaintiff's termination, as Notices of EEOC charges are sent directly to Iron Mountain's Legal Department in Massachusetts—not to the O'Fallon facility.[8] Doc. [30] ¶¶ 51, 52 (citing Docs. [28-1] ¶ 27, [28-2] ¶¶ 12, 13). Plaintiff filed this action in state court, alleging that Defendant harassed him, and discriminated and retaliated against him based on his race and gender in violation of the Missouri Human Rights Act (MHRA). Doc. [4]. Defendant removed the case on December 17, 2020, Doc. [1], and filed the instant Motion for Summary Judgment on December 17, 2021, requesting judgment as a matter of law on all of Plaintiff's claims. Doc. [25].

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant a motion for summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

---

[8] Plaintiff disputes this and contends that Williams and Boykin would have been aware of his filing of the Charge of Discrimination during the three months between the filing and his termination. Doc. [30] ¶ 51. Plaintiff cites only his own testimony for this proposition. *See id.* Similarly, Boykin's declaration provides no evidence beyond her own testimony that EEOC Notices are sent directly to the legal department in Massachusetts. Doc. [28-2] ¶ 13.

6

interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted). The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1079 (8th Cir. 2008)).

## DISCUSSION

Defendant argues that it is entitled to summary judgment because Plaintiff's hostile work environment, discrimination, and retaliation claims under the MHRA fail as a matter of law. Doc. [26] at 6-7. For the reasons set forth below, the Court agrees.

### I. **Defendant is entitled to summary judgment on Plaintiff's hostile-work-environment claim.**

Defendant argues that it is entitled to summary judgment on Plaintiff's hostile-work-environment claim because: (1) none of the alleged harassment was related to Plaintiff's race or gender, and (2) the alleged conduct was not such severe or pervasive harassment that it "altered a term, condition or privilege" of Plaintiff's employment. Doc. [26] at 3.

"The MHRA's prohibition against employment discrimination includes within its scope . . . generalized claims of discrimination based on a course of conduct, such as claims based on a hostile work environment." *Clark v. AT&T Mobility Servs., L.L.C.*, 623 S.W.3d 197, 204 (Mo. Ct. App. 2021) (quoting *Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 797 (Mo. Ct. App. 2018)). "A successful claim of a hostile work environment requires the plaintiff to show: (1) he is a member of a group protected under the MHRA; (2) he was subjected to unwelcome harassment; (3) the plaintiff's membership in the protected group was a motivating factor in the harassment; and (4) a term, condition, or privilege of the plaintiff's employment was affected by the harassment." *Eivins v. Missouri Dep't of Corr.*, 636 S.W.3d 155, 179 (Mo. Ct. App. 2021).

Defendant argues that the harassment identified by Plaintiff is not, on its face, race- or gender-based conduct, and thus Plaintiff fails to meet the third prong of the hostile-work-environment claim—demonstrating that his membership in the protected group (i.e., being African-American or male) was a motivating factor in the harassment. Doc. [26] at 8. Defendant lists several instances of harassment during Plaintiff's employment, including: Crenshaw commenting "it stinks" and turning off the lights in the bathroom while Plaintiff was

7

inside, then apologizing, saying, "my bad, brother"; Crenshaw repeatedly telling Plaintiff to move faster with his work and telling him he was slow; Crenshaw asking Plaintiff why he said "der" instead of "there" and telling him that he didn't "have to be talking all ghetto"; Crenshaw telling Plaintiff that he had "stunk up the bathroom"; Crenshaw acting distant from Plaintiff; Mullen's comments related to the game he liked to play called "ring the rat's neck"; and finally, the conversations that Williams, Mosillo, and Crenshaw had with Plaintiff discussing his alleged performance issues. *Id.* at 9 (citing Doc. [27] ¶¶ 14, 25, 36, 37, 38-41).[9]

None of that conduct, Defendant argues, is reasonably connected to Plaintiff's race or gender; Plaintiff's assertion that any of the conduct was related to his race or gender is "based entirely on speculation[.]" Doc. [26] at 4. Defendant also notes that a majority of the alleged harassment is imputed to Crenshaw, who is himself an African-American male, *id.* (citing Doc. [27] ¶¶ 12, 14, 25-26, 36), which "cuts against any inference of race or gender-based animus." *Id.* Defendant also notes that Plaintiff admits that, during his temporary employment period at Iron Mountain, Williams, Mosillo, and Mullen did not engage in any allegedly harassing behavior; therefore, it would not be logical to assume that, several months later, their conduct would become motivated by gender or racial animus. *Id.* at 9-10.

In response, Plaintiff highlights several instances of harassment that Defendant did not address, including: Crenshaw flatulating and laughing about it; Mullen and Crenshaw "lying" about whether Plaintiff told him he was leaving work early on the day of the COVID-related incident; Crenshaw elbowing Plaintiff; the issuance of the final warning when he left work in part to care for his sick daughter while females and Caucasians were not disciplined for the same conduct; Defendant's failure to pay him for all of the days he was suspended; the supervisors' frequent accusations that he was not performing his duties correctly; Crenshaw's harassment of

---

[9] Defendants correctly point out that Plaintiff relies on inadmissible hearsay as evidence of certain incidents of alleged harassment. *See* Doc. [39] at 5, 7 (citing Doc. [28-3] at 104:13-20 (Dees testifying that he had heard from Erica Rodgers that Crenshaw called him "doo doo boy"); Doc. [28-3] at 164:10-16 (Dees testifying that "someone told him" that Crenshaw referred to him as "that brother"); Doc. [28-3] at 134:16-25, 135:1 (Dees testifying that someone else heard Mullen and Crenshaw discussing his suspension)); *see also* Doc. [28-3] at 159:9-11 (Dees testifying that other individuals told him that Crenshaw had told them to stay away from him and that he's on his last leg). The Court excludes those incidents from its summary judgment analysis. *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004) ("Only admissible evidence may be used to defeat [a summary judgment motion], and affidavits must be based on personal knowledge.") (citations omitted); *see also Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1319 (8th Cir. 1986) ("[A] party may not rely on inadmissible hearsay in opposing a motion for summary judgment.").

8

him for wearing a uniform that was too big; his isolation to a remote part of the building and assigning him undesirable assignments; Crenshaw's failure to give him a bonus gift card that other employees received; Crenshaw and Mullen's harassment regarding Plaintiff's late return from breaks when other female and Caucasian workers were not; Crenshaw intentionally assigning him additional work so that it would be more difficult to him to perform well in performance rankings; Mullen accusing him of bad performance and telling him he could not wear headphones when other female workers were permitted to.  Doc. [29] at 4-7.

No doubt, Plaintiff has testified to *many* instances of workplace mistreatment.  And if that were all that is required to make a submissible case for a hostile-work-environment claim under the MHRA, summary judgment would be denied.  But Plaintiff also has to point to sufficient evidence for a reasonable factfinder to conclude that his membership in a protected class was a motivating factor in his mistreatment.  *See* Mo. Rev. Stat. § 213.010(2), (19).  In his Opposition, Plaintiff cites only his own deposition testimony, together with speculation and legal conclusions.[10]  *See* Doc. [29] at 8.  For example, Plaintiff argues that Mullen "harassed, discriminated, and retaliated against [him] because of his race, color and gender," citing Plaintiff's own testimony that Mullen's mistreatment of him "could have been" motivated by race and "could have been" motivated by gender.  *Id.* (citing Doc. [28-3] at 172:21-173:15).  Pressed for the reason for those beliefs, Plaintiff stated "I mean he didn't do it to anyone else," and "I noticed that he like treated, you know, people of the opposite sex like different . . . like he was just more lenient to them."  Doc. [28-3] at 173:1-15.  Plaintiff cites no other evidence to support those impressions.  Similarly, with respect to the other supervisors, Plaintiff claims that they "harassed, discriminated, and retaliated against [him] because of his race, color and gender" by "unfairly criticizing [his] work" when he returned from the suspension.  *Id.* at 6, 7.  But again,

---

[10] Plaintiff does cite an interrogatory response where he lists "persons who have or whom you believe have knowledge of facts relating to the allegations contained in [his] Complaint," together with "facts known by each person and . . . how much knowledge was obtained by that person."  *See* Doc. [29] at 9 (citing Doc. [30-2] at 1-2).  Plaintiff cites the response as evidence that he "has testified that he has witnesses . . . to back up his claims that Caucasian and female workers that were similarly situated were treated better than him."  *Id.*  There are two problems with relying on the interrogatory response as evidence that race or gender was a motivating factor in his mistreatment.  The first is that it contains no actual testimony from any of the supposed witnesses, and Plaintiff points to no other such testimony in the record.  And second, in the interrogatory response itself, responding a request to "state with specificity the facts known by each person," Plaintiff does not state that any of them would testify that he was mistreated due to his race or gender, or even to differential treatment between individuals of different races or genders.  *See* Doc. [30-2] at 1-2.

the only evidence cited for the causal claim is Plaintiff's own deposition, wherein he repeatedly states that the harassment "could have been" because of race or gender discrimination but denies being sure. *See, e.g.*, Doc. [28-3] at 157:6-158:12 ("I'm not sure. I mean it could have—it could have been anything."); 165:12-16 ("it could be a possibility"); 168:3-13 ("I'm not sure if it was just a me thing or not but…"); *see also, e.g.*, Doc. [28-3] at 131:10-16 (Q: "Now, are you claiming that the suspension was race discrimination?" A: "I believe it could have been anything.").

Even if weren't equivocal, Plaintiff's self-serving testimony alone would not be sufficient to generate a genuine dispute of material fact as to whether Plaintiff's membership in a protected class was a motivating factor in his mistreatment. *See Chavero-Linares v. Smith*, 782 F.3d 1038, 1041 (8th Cir. 2015) ("A properly supported motion for summary judgment is not defeated by self-serving affidavits. Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." (quoting *Frevert v. Ford Motor Co.*, 614 F.3d 466, 473-74 (8th Cir. 2010))). Therefore, Defendant is entitled to summary judgment on Plaintiff's hostile-work-environment claim.

## II.     Defendant is entitled to summary judgment on Plaintiff's discrimination claim.

Defendant also contends that Plaintiff's discrimination claim fails as a matter of law. Doc. [26] at 12. Under the MHRA, it is unlawful for an employer to refuse to hire, to discharge, or to otherwise discriminate against an individual because of, among other things, the individual's race or gender. Mo. Rev. Stat. § 213.055.1(1)(a). An employer discriminates "because of" race or gender when the individual's race or gender was "the motivating factor" in the adverse employment decision, § 213.010(2), and race or gender is "the motivating factor" when it "actually played a role in . . . and had a determinative influence on" the decision, § 213.010(19). The MHRA's "motivating factor" standard requires proof that one's race or gender was more than a mere contributing factor in the adverse employment decision, and it is comparable to the standard applied in federal Title VII claims. *See Bram*, 564 S.W.3d at 794-95 ("The [motivating factor] standard is analogous to the one used in employment discrimination claims under federal law[.]").

10

When an employer files a summary judgment motion in an MHRA case based on indirect evidence of discrimination,[11] Missouri courts apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Mo. Rev. Stat. § 213.101.3; *see Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014). Under that framework, the plaintiff must first establish a prima facie case of discrimination by demonstrating: "(1) he was a member of a protected class; (2) he was qualified to perform his job; (3) he suffered an adverse employment action; and (4) he was treated differently than similarly situated [Caucasian or female] employees." *Cafiero v. Keurig Dr Pepper Inc.*, 2021 WL 5630373, at *2 (E.D. Mo. Dec. 1, 2021) (quoting *West v. Minact, Inc.*, 2021 WL 4497853, at *5 (W.D. Mo. Sept. 30, 2021)).

Once the employee makes his *prima facie* showing, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its action." *Fiero*, 759 F.3d at 878. If Defendant makes that showing, then the burden shifts again and Plaintiff "must show that the proffered nondiscriminatory reason is merely a pretext for unlawful . . . discrimination." *Id.* (quoting *Putnam v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003)). "When reviewing cases under the [MHRA, courts] are guided by both Missouri law and any federal employment discrimination case law that is consistent with Missouri law." *Lampley v. Mo. Comm'n on Human Rights*, 570 S.W.3d 16, 22 (Mo. 2019) (cleaned up) (quoting *Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 76 (Mo. Ct. App. 2015)).

Of all the harassing conduct identified by Plaintiff, only his termination constitutes an "adverse employment action" that is cognizable under the MHRA. An adverse employment action is one which results in "a material employment disadvantage, such as a change in salary, benefits, or responsibilities." *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891 (8th Cir. 2005) (quoting *Sallis v. Univ of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005)). Plaintiff alleges many other adverse actions, in addition to his termination: being moved to a "remote part of the building," being assigned "undesirable boxes and pallets," being assigned additional work duties that made

---

[11] Plaintiff has not presented direct evidence supporting his allegations of discrimination. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011) ("[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." (internal quotation marks and citation omitted)). He does not appear to contest that fact, as he does not dispute Defendant's application of the *McDonnell Douglas* standard to his claims and addresses his claim under that standard. *See* Doc. [29] at 8 ("Plaintiff has presented sufficient evidence to meet his burden under the MHRA and the analysis under *McDonnell Douglas* . . . .").

it more difficult to perform his job well, being denied a bonus gift card that other employees received, not being paid for all the days that he was suspended, and enduring general harassment regarding his work performance when he returned from his suspension. Doc. [29] at 9-10. But "minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Warr v. Hagel*, 14 F. Supp. 3d 1244, 1250 (E.D. Mo. 2014).

Plaintiff's removal to a new location in the O'Fallon facility and being assigned undesirable work or more difficult work are clearly "minor changes in duties or working conditions," and therefore are not adverse employment actions, even if they were unwelcome. *See Turner v. Gonzales*, 421 F.3d 688, 697 (8th Cir. 2005) ("We are not persuaded that the normal inconveniences associated with any transfer . . . are sufficient, without more, to demonstrate a significant change in working conditions."); *Watson v. McDonough*, 996 F.3d 850, 855 (8th Cir. 2020) (employee's "assignment of additional . . . work" was not an adverse employment action). With respect to Plaintiff's suspension without pay and the failure to receive the gift card,[12] neither a short period of leave without pay nor the absence of a discretionary bonus payment constitutes an adverse employment action. *See Hawkins v. McDonough*, 2021 WL 5514004, at *6 n.4 (W.D. Mo. Aug. 24, 2021) ("[T]he loss of a bonus is not an adverse employment action in a case . . . where the employee is not automatically entitled to the bonus." (quoting *Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc.*, 285 F. Supp. 2d 1180, 1189 (N.D. Iowa 2003))); *Schwarzkopf v. Brunswick Corp.*, 833 F. Supp. 2d 1106, 1120 (D. Minn. 2011) ("Suspensions without pay generally do not satisfy [the adverse employment action] standard unless they involve collateral consequences." (citing *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891 (8th Cir. 2005))). And "the Eighth Circuit has rejected the theory that continued harassment or hostility can constitute an adverse employment action." *Kpou v. Supervalu, Inc.*, 556 F. Supp. 3d 940, 965 (D. Minn. 2021) (citing *Carpenter v. Con-Way Cent. Express, Inc.*, 2006 WL 8437353, at *10 (S.D. Iowa May 31, 2006)). Therefore, only Plaintiff's termination qualifies as an adverse employment action for the purposes of his discrimination claim.

As described above, Plaintiff has not produced any evidence, other than his own equivocal deposition testimony, that he was treated differently from Caucasian or female

---

[12] For purposes of this Order, the Court assumes that there is a genuine issue of material fact as to whether Plaintiff was paid in full or in part for the time he was on leave for the suspension. *See* Doc. [37] ¶ 19.

employees with respect to any of the mistreatment he complained of, including his termination. *See supra* Section I; *see* Doc. [29] at 9. It is true that "[c]ourts in this district have clarified that disparate treatment relative to similarly situated employees is not a strict requirement, but only 'one way to show' that discrimination motivated an adverse employment action." *Cafiero*, 2021 WL 5630373, at *2 (quoting *Krone v. City of Pine Lawn*, 2017 WL 1424320, at *1 (E.D. Mo. Apr. 20, 2017)). But as also elaborated above, Plaintiff has not produced any other evidence that "discrimination motivated" his termination either. *Id.*; *see supra* Section I. Therefore, Plaintiff has not satisfied step one of the McDonnell Douglas framework for proving his MHRA discrimination claim.

Even if he had satisfied the elements of the *prima facie* discrimination case with respect to his termination, his claim would still fail because Defendant has met its burden under step two of the McDonnell Douglas framework by demonstrating a legitimate, nondiscriminatory reason for his termination, and Plaintiff has produced no evidence that Defendant's rationale is pretextual. *See Fiero*, 759 F.3d at 878. Specifically, Defendant has shown that from April 2020 until his termination, Plaintiff had significant performance and productivity issues, which resulted in Williams's decision to terminate him. Williams, Mosillo, and Crenshaw repeatedly addressed mistakes with Plaintiff related to his misclassification of boxes and errors in creating tags. Doc. [30] ¶ 39.[13] The supervisors also addressed other issues with Plaintiff's performance, including his failure to wear his uniform and failure to remove his headphones when asked by management. *Id.* Moreover, Defendant submitted testimony from Williams that, when Plaintiff was moved to the X-ray assignments, his "productivity lagged behind other workers who were assigned" the same tasks. *Id.* ¶ 43 (citing Doc. [28-1] ¶ 21); *see also* Doc. [28-3] 184:10-185:9 (Plaintiff testifying that he was "called out" in team meetings because his "production needed to get better" and that he was not aware of any other people who "needed to step it up"). Defendant notes that at least one new employee quickly outperformed Plaintiff "in terms of the number of boxes per week and boxes per hour" completed. Doc. [30] ¶ 44. Ultimately, according to

---

[13] Plaintiff purports to deny this fact but he fails to specifically controvert the facts asserted. *See* Doc. [30] ¶ 39. Therefore, the fact is deemed admitted. *See* E.D.Mo. L.R. 4.01(E) ("All matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless *specifically controverted* by the opposing party." (emphasis added)).

Williams, he chose Plaintiff to be terminated because he was the least productive individual on the team. *Id.* ¶ 48 (citing Doc. [28-1] ¶ 26).[14]

In response to Defendant's nondiscriminatory reason for Plaintiff's termination, Plaintiff states that he "has presented evidence that the Defendant's actions against him were pretext for discrimination and harassment." Doc. [29] at 10. But he points to no such evidence. That conclusory statement cannot rebut Defendant's showing of a legitimate and nondiscriminatory reason for his termination. Accordingly, Defendant is entitled to summary judgment on Plaintiff's discrimination claim.

### III.   Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

Finally, Defendant claims to be entitled to summary judgment on Plaintiff's retaliation claim. Doc. [26] at 17. Under the MHRA, an employer may not "retaliate or discriminate in any manner against any other person because such person has opposed any practice" prohibited by the MHRA or "has filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing conducted pursuant to" the MHRA. Mo. Rev. Stat. § 213.070.1(2). To make a *prima facie* MHRA retaliation claim, the plaintiff must establish that: (1) he complained of discrimination, (2) the employer took an adverse action, and (3) a causal relationship existed between the complaint and the adverse action." *Holmes v. Kansas City Pub. Sch. Dist.*, 571 S.W.3d 602, 611 (Mo. Ct. App. 2018) (citing *Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 48 (Mo. Ct. App. 2016)). The causation standard for a retaliation claim requires the plaintiff to demonstrate that his protected activity was "the motivating factor," meaning that his "protected classification actually played a role . . . and had a determinative influence" on the adverse action. Mo. Rev. Stat. § 213.010(2), (19). Like a discrimination claim under the MHRA, if a plaintiff satisfies the *prima facie* case for retaliation, "the defendant then has the burden of showing a legitimate, non-discriminatory reason for the challenged action. If the defendant offers such a reason, the burden shifts back to the plaintiff to show the defendant's proffered reason is a pretext." *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015) (citing *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003)).

---

[14] Plaintiff's objections to the facts alleged in Paragraphs 42, 44, and 48 of Defendant's SUMF are overruled. *See* Doc. [30] ¶¶ 42, 44, 48. Defendant relies not just on a declaration based on personal knowledge of a person who is competent to testify to the matter stated, *see* Rule 56(c)(4), but also on Plaintiff's own deposition testimony in support of the facts alleged in those paragraphs, and Plaintiff does not specifically controvert those facts. Therefore, they are deemed admitted. *See* E.D.Mo. L.R. 4.01(E).

The record does not indicate that Plaintiff filed a complaint with Iron Mountain, but Plaintiff did contact Mosillo and Williams "concern[ing] . . . Crenshaw's behavior towards [him]," although he doesn't remember whether he "brought up race, color or gender." Doc. [30] ¶ 21. After that conversation, Williams flew to the O'Fallon facility to hold a meeting with Plaintiff and Crenshaw, at which the two "apologized" and "shook hands." *Id.* ¶ 23. Defendant contends that Plaintiff did not complain of harassment or discrimination by Crenshaw on the basis of race or gender, but Plaintiff maintains that Williams knew "how he felt about [Crenshaw's] behavior" (i.e., that it was harassing). *Id.* ¶ 24. In May 2020, Plaintiff filed his first Charge of Discrimination, Docs. [29] at 13; [30] ¶ 49, but Defendant contends that Mosillo, Williams, and Crenshaw were unaware of that filing because Plaintiff "did not tell anyone at Iron Mountain" about it. Doc. [30] at ¶¶ 50, 51.

Plaintiff argues that, because of his complaints of discrimination and harassment, including the March 2020 conversation and the May 2020 Charge, he was "subjected to several adverse actions" including: (1) being wrongly accused of inciting the panic related to the potential COVID-19 infection; (2) being harassed by Williams, Mosillo, and Crenshaw about his work performance after he returned from his suspension; (3) being isolated in a remote part of the building; (4) being assigned undesirable tasks; (5) being assigned additional duties intentionally so that he could not "get his numbers to where they should be in the performance rankings"; and (6) being terminated. Doc. [29] at 12-13.

Defendant contends that neither the internal complaint nor the Charge of Discrimination provides a sufficient basis for Plaintiff's retaliation claim to survive summary judgment. First, Defendant contends that the internal complaint did not discuss any harassment or discrimination, and instead, only mentioned his interpersonal issues with Crenshaw unrelated to gender or race, therefore failing the first prong of the *prima facie* case: that he complained of discrimination. Second, Defendant argues that the Charge of Discrimination also fails the third prong of the *prima facie* case because Plaintiff has provided no evidence that anyone at Iron Mountain, including the person responsible for his termination, Williams, was aware of his Charge. Doc. [36] at 10-11.

Even assuming Plaintiff's internal complaint satisfied the first element of the *prima facie* case, both that complaint and the Charge of Discrimination fail the third requirement: causation. Plaintiff has not presented any evidence that his complaints "actually played a role . . . and had a

15

determinative influence" on the adverse action.  Mo. Rev. Stat. § 213.010(2), (19); *O'Toole*, 2022 WL 782306, at *3.  Instead, Plaintiff merely speculates that the adverse actions he suffered were in retaliation for the two complaints.  Again, Plaintiff provides no evidence at all for causation other than conclusory statements of his own belief.  *See* Doc. [29] at 12-13.

Without any evidence, Plaintiff argues that because he suffered adverse actions after complaining, the complaints must have *caused* the adverse actions.  *Id.* at 12 ("No one at Iron Mountain had any issues or said anything to [Plaintiff] about his work performance until he started complaining about the harassment and discrimination); *id.* at 13 (arguing that the fact that Plaintiff suffered adverse actions and was terminated three months after the Charge was filed demonstrates causation).  While showing that an adverse employment action "so closely followed the protected activity in time *could* justify an inference of retaliatory motive," *Altenhofen v. Fabricor, Inc.*, 81 S.W.3d 578, 584 (Mo. Ct. App. 2002) (citing *Rath v. Selection Rsch., Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992)) (emphasis added), Plaintiff has not demonstrated that Defendant took any adverse action so close in time after his complaints that it gives rise to an inference that the action was retaliatory.  By Plaintiff's own account, directly after his first complaint, "everything was fine at that point [and] remained good for a little bit."  Doc. [30] ¶ 23.  Plaintiff contends that the harassment about his work performance started in April 2020—a month *before* the Charge of Discrimination was filed.  *Id.* ¶ 38, 49.  And despite filing the Charge in May 2020, he was not terminated until August 26, 2020.  *Id.* ¶ 48.  Absent a showing of close temporal proximity between the complaints and the alleged retaliation, the fact that an adverse action occurred at some point after Plaintiff complained does not prove a causal relationship between the two occurrences.  *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998) ("*Post hoc ergo propter hoc* is not enough to support a finding of retaliation . . . .").

Because Plaintiff has failed to satisfy his burden to demonstrate a *prima facie* case of retaliation under the MHRA, Defendant is entitled to summary judgment on that claim.  *See Holmes*, 571 S.W.3d at 611.

## CONCLUSION

Plaintiff has not made a sufficient showing to sustain his harassment, discrimination, or retaliation claims under the MHRA.  Therefore, Defendant is entitled to summary judgment on all three claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, Doc. [25], is **GRANTED.**

A separate Judgment accompanies this Memorandum and Order.

Dated this 30th day of September, 2022.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE